IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JANE DOES 1-12 <br> *Plaintiffs,* <br> v. <br><br> LIBERTY UNIVERSITY, INC. | Case No.:_____ |

## COMPLAINT

Plaintiffs Jane Doe 1-through-12, through their attorney, Gawthrop Greenwood, PC, hereby Complain of Liberty University, Inc., and in support thereof allege as follows:

### *PARTIES*

1.      Liberty University is a Virginia Corporation that does business in the State of New York through its "Liberty University Online" program and interactive website, which solicits payment and actually provides educational services, remotely, to residents of New York.

2.      Jane Doe 1 is an adult individual residing in Islip, NY.

3.      Jane Doe 2 is an adult individual residing in Spotsylvania, VA.

4.      Jane Doe 3 is an adult individual residing in Charlotte, NC.

5.      Jane Doe 4 is an adult individual residing in Tomball, TX.

6.      Jane Doe 5 is an adult individual residing in Lynchburg, VA.

7.      Jane Doe 6 is an adult individual residing in Charlottesville, VA.

8.      Jane Doe 7 is an adult individual residing in Decatur IN.

9.      Jane Doe 8 is an adult individual residing in Frederick, MD.

10.     Jane Doe 9 is an adult individual residing in Hudsonville, MI.

11.     Jane Doe 10 is an adult individual residing in Fort Worth, TX.

12.     Jane Doe 11 is an adult individual residing in Barboursville, VA.

13.     Jane Doe 12 is an adult individual residing Goochland, VA.

### JURISDICTION & VENUE

14.     This action arises under, *inter alia*, 20 U.S.C. § 1681, which prohibits educational discrimination on the basis of sex and, accordingly, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (relating to federal question jurisdiction) and 28 U.S.C. § 1333(a)(3) (relating to equal rights actions).

15.     This Court has personal jurisdiction over Defendant Liberty University because it operates an interactive website that allows users to purchase services and receive online education entirely in New York.  Moreover, it is known that Liberty University has actually provided those services in New York, because certain of its remote students and prospective students have filed claims against it here in the past.[1]

16.     Moreover, Doe 12's Section 2255 claim may be brought in any United States District Court where venue is proper, including in this Court.

17.     To the extent that any claims set forth herein are not wholly within the subject matter jurisdiction of this Court pursuant to 28 U.S.C. §§ 1331-1333, this Court has supplemental jurisdiction over the remaining state court claims pursuant to 28 U.S.C. § 1367.

---

[1] *See, e.g., Jones v. Liberty University*, 1:19-cv-04704-CM; *also, Lawrence Young, et al., v. Liberty University, Inc*, 1:19-cv-04704-CM.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) inasmuch as the University is a corporation subject to personal jurisdiction in this District.

### STATUTE OF LIMITATIONS

19.     Title IX has no explicit statute of limitations and, as a result, federal courts apply the most appropriate or analogous state statute of limitations.

20.     The borrowing of a state-law statute of limitations carries with it the borrowing of the state's coordinate tolling rules, at least where such rules are not inconsistent with the letter and purpose of relevant provisions of federal law.

21.     In assessing the relevant statute of limitations, the Court of Appeals for the Second Circuit has determined that Title IX actions are most analogous to personal injury actions.

22.     While this generally yields a three-year statute of limitations, the most analogous statute of limitations in this action is N.Y.C.P.L.R. § 213-c, which provides a twenty-year statute of limitations for the adult victims of sexual offenses and N.Y.C.P.L.R. § 208 for the minor victim of sexual offenses.

23.     Notably, Section 213-c is broad, encompassing any party whose intentional or negligent acts or omissions are alleged to have resulted in the commission of the said conduct, and not merely the perpetrator.

24.     Moreover, the University owed a statutory duty to the Plaintiffs to inform them of their rights under Title IX but, instead, failed to do so and, to the contrary, threatened many of them, tacitly or explicitly, with discipline and expulsion if they pressed those rights.  To whatever extent Plaintiff's claims do not fall into the expanded

statute of limitations for the victims of sexual violence, this extraordinary violation of the University's obligations constitutes sufficient extraordinary obstruction to entitle the Plaintiffs to equitable tolling.

### *RELEVANT LEGAL PROVISIONS*

25.     Title IX provides that no "person in the United States shall, on the basis of sex, be excluded from participation in, denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance. . ."  20 U.S.C. § 1681(a).

26.     Sexual harassment, including sexual assault and rape, can constitute impermissible gender discrimination under Title IX.  *See, Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 649-50 (1999).

27.     As early as November 2, 2000, the Department of Education issued guidance making it the responsibility of Institutions of Higher Education to remedy hostile environments, including campus-wide hostile environments, by updating their policies, procedures, and student training, where necessary:

> If a hostile environment has affected an entire school or campus, an effective response may need to include dissemination of information, the issuance of new policy statements, or other steps that are designed to clearly communicate the message that the school does not tolerate harassment and will be responsive to any student who reports that conduct.

*Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*, 65 FR 66092-01

28.     The same guidance made clear that Institutions of Higher Education had an obligation to follow up on reports of sexual assault where reports were made:

At a minimum, this includes making sure that the harassed students and their parents know how to report any subsequent problems and making follow-up inquiries to see if there have been any new incidents or any retaliation. To prevent recurrences, counseling for the harasser may be appropriate to ensure that he or she understands what constitutes harassment and the effects it can have. In addition, depending on how widespread the harassment was and whether there have been any prior incidents, the school may need to provide training for the larger school community to ensure that students, parents, and teachers can recognize harassment if it recurs and know how to respond.

*Id.*

### LIBERTY UNIVERSITY'S CREATION OF AN UNSAFE ENVIRONMENT

29.     Liberty University has intentionally created a campus environment where sexual assaults and rapes are foreseeably more likely to occur than they would in the absence of Liberty's policies.

30.     Broadly speaking, Liberty University has created an unsafe campus environment in three key ways: (a) the creation and weaponization of a student honor code called "the Liberty Way" that makes it difficult or impossible for students to report sexual violence; (b) the promotion of a tacit but widely observed policy that condoned sexual violence, especially by male student athletes; and (c) the public and repeated retaliation against women who did report their victimization.

#### A.     The Weaponization of the "Liberty Way."

31.     Liberty University maintains an honor code it calls the "Liberty Way."

32.     A copy of the "Liberty Way" is attached at Exhibit "A."

33.     The Liberty Way prohibits sexual harassment, discrimination and assault, and notes that all "members of the Liberty community are expected to treat everyone with a spirit of Christian love, mutual respect, and individual dignity."

34.    The University purports to offer support programs "to promote our commitment to biblical principles of abstinence and purity."

35.    The Liberty Way specifically provides that unmarried students may not engage in consensual sexual conduct of any kind:

> Sexual relations outside of a biblically ordained marriage between a natural-born man and a natural-born woman are not permissible at Liberty University.  In personal relationships, students are encouraged to know and abide by common-sense guidelines to avoid the appearance of impropriety. Activities outside of these standards and guidelines are violations of the Student Honor Code.

36.    The Liberty Way goes on to explain that this provision is violated by "inappropriate personal contact, visiting alone with the opposite sex at an off-campus residence; entering the residence hallway, quad, or on-campus apartment of the opposite sex or allowing the same, or visiting any dwelling or residence with a member of the opposite sex in inappropriate circumstances."

37.    In addition to these "minor" infractions, Liberty University would issue students eighteen "points," fine students $250, and require them to perform eighteen hours of community service if they: (a) intentionally attended an event where alcohol is served; (b) were in "any state of undress with member of opposite sex"; or (c) watched an NC-17 rated film or played an "A" rated video-game.

38.    The Liberty Way authorized the University to expel students who were guilty of sexual "immorality" or for "spending the night with a member of the opposite sex" and for "possession or consumption of alcoholic beverages."

39.     The Liberty Way contains a policy regarding self-reports.  That policy provides that if a self-report is made within one-week of the misconduct, and there is no pre-existing investigation into the offense, then the Dean of Students Office "will work with the student in setting the necessary boundaries and accountability measures in place to foster an environment for growth."

40.     In other words, the self-reporting policy does not explicitly provide amnesty from the imposition of points, fines, or expulsion, but only provides that self-reporting students will be required to undergo counseling "boundaries" and "accountability measures" without further clarification.   Moreover, the purported amnesty is only available for the first ten days following an 'offense.'

41.     The Liberty Way includes another exception with respect to reports by the victims of witnesses of sexual violence:

> **In order to encourage reports of conduct prohibited under this policy, an alleged victim or cooperating witness that may have been involved in a Code of Honor violation who makes a voluntary report or gives evidence to the Title IX Office related to a Title IX investigation, will be treated similarly to a Self-Report for Honor Code purposes.**  For example, if an alleged victim or cooperating witness reports a Title IX violation or gives truthful testimony in support of a Title IX investigation and that report or testimony implicates a student as having been involved with another Code of Honor violation (e.g. alcohol, immorality), the cooperating witness will not be sanctioned for that conduct.  Under this provision, a cooperating witness may be asked to participate in development opportunities or educational services.

42.     This provision is confusing, at best, because it (a) equates a report to Title IX to a self-report, which is time-limited and does not offer an explicit amnesty but, instead, makes clear that the University may impose "accountability measures";

(b) claims that those who report to Title IX will not be sanctioned for violations of the Liberty Way; and (c) imposes the obligation on reporters to participate in "development opportunities" and "educational services." In other words, this provision of the Liberty Way is hard to understand.

43.     Liberty University also has a Title IX Policy, which it has updated from time-to-time, and which is available from 2015-through-present online in appendices to Liberty University's Clery Act reports.

44.     In 2015, Liberty University's Title IX Policy, like the Liberty Way, simply (and confusingly) promised students that those reporting sexual violence would "be treated as a 'self-report' for disciplinary purposes for any violation of the Liberty Way Code of Conduct in connection with the reported incident."

45.     In 2016, Liberty University's Title IX Policy included an expanded amnesty for reporters: "Self-reporting means that students will not be held responsible under the Student Honor Code for their own conduct violations, to which they admit to committing when reporting an alleged Title IX incident."  Confusingly, however, the same policy went on to note that "an alleged victim or cooperating witness may be asked to participate in student development opportunities or educational services upon review by the Student Progress Committee."

46.     In 2017 the amnesty was again revised, but still permitted the University to "initiate an initial inquiry or educational discussion, or pursue other non-disciplinary options, in response to alcohol or other drug use or immorality."

47.     In 2018, the amnesty was revised again.  This time, the amnesty made clear that the University would not pursue disciplinary action against Complainants, Respondents, or cooperating witnesses for "consumption of alcohol or other drugs. . . or immorality[.]"  The same policy, however, provided that this amnesty was available for "minor policy violations related to the incident" and, oddly, that in "lieu of taking disciplinary action in such cases, the University may require the person receiving amnesty to participate in education."

48.     Regardless of the subjective intent of the drafters of these policies, their actual application was uneven at best.

49.     Some students who were the victims of sexual violence, including Plaintiffs below, reported their assaults to the University through RAs, and were urged to withdraw those reports because they involved admitted violations of the Liberty Way. Those students, including certain of the Plaintiffs, were told that their reports would subject them to discipline that could include expulsion.  They, apparently, did not qualify for the amnesty, though no explanation for why was given.

50.     Some students who actually self-reported their own violations of the Liberty Way or were the victims of sexual violence, including Plaintiffs below, were actually disciplined and fined in spite of their prompt report.

51.     Some students, including certain of the Plaintiffs below, declined to report assaults against them altogether because of stories they had heard from other victims and witnesses about how the University punished the victims of sexual violence.

52.     In short, Liberty University weaponized its sexual violence reporting policies by (a) offering the victims of sexual violence a confusingly worded amnesty that (b) was often ignored altogether in practice.

### B.     Tacit Policy of Deliberate Indifference.

53.     During the investigation of this Complaint, multiple witnesses who previously worked in the Office of Student Conduct came forward to discuss their experiences there.

54.     Multiple witnesses who worked in the student conduct office have alleged that the University had a tacit policy of weighting investigations in favor of accused male students such that denials of sexual misconduct by male students would regularly be accepted over allegations by female victims, including where the victim brought additional evidence to support her claim like photographs of bruising or text messages from the accused admitting to assault.

### C.     Public Retaliation Against Female Reporters

55.     In addition to the foregoing, multiple witnesses, including certain of the Plaintiffs, have confirmed that Liberty University took action across multiple levels of its hierarchy to punish women who reported sexual violence.

56.     As noted above, some women were discouraged from making reports because, they were explicitly told, they would be subject to discipline for violating the Liberty Way.

57.     Some women who participated in the Title IX process or called the Liberty University Police were subjected to humiliating 'investigations' that applied a negative-

consent standard (i.e. a woman was presumed to have consented to sex unless she could prove that she had resisted her assault.)

58.    Other women were actually fined and assessed "points" under the Liberty Way.

59.    These experiences predictably became public, and discouraged future victims from reporting their assaults.

### *JANE DOE 1*

60.    Jane Doe 1 is an adult individual who was, in 2013, an employee of Liberty University.

61.    On or about October 15, 2013, Jane Doe 1 suffered an allergic reaction and advised her supervisor, Keith Anderson, a Liberty University employee and high managerial officer, of the same.

62.    Anderson announced his intent to come to Jane Doe 1's home and provide her medication.  Doe 1 refused the offer.

63.    In spite of her refusal, Anderson arrived at Jane Doe 1's home at approximately 2:00am, in spite of the fact that Doe 1 had never shared her address with him.

64.    Doe 1 demanded that Anderson leave, but he refused to do so unless she took the medication he brought with him—a single, unmarked and unwrapped tablet.  In an attempt to get Anderson to leave, Doe 1 complied.

65.    In spite of his promise, Anderson continued to refuse to leave in spite of repeated demands, purportedly to ensure that Doe 1 got to bed safely.

66.     Shortly thereafter, Doe 1 became woozy, and passed out on her sofa.  She woke up some time later with Anderson's hands on her neck, whereupon she again demanded that he leave, and threatened to scream to alert the neighbors and call the police.  Anderson finally left.

67.     The next day, Anderson again showed up at Doe 1's apartment, this time offering Doe 1 a gift of food.  He denied that he had touched her neck or any other part of her during the prior night, but asked to be permitted to rub medicated cream on Doe 1's body.

68.     Doe 1 initially refused Anderson's demands but, in an attempt to get him to leave, Doe 1 eventually complied with his request, and allowed him to apply medicated cream to her back.  While doing so Anderson forcefully kissed her, on the lips, against her will.

69.     Doe 1 rejected the kiss and physically forced Anderson away from her, whereupon he became threatening.

70.     Anderson threatened to have Doe 1, who was at the time a foreign national working on an H-1B visa, deported if she shared the events of the last two days.

71.     In the coming weeks, Anderson undertook a targeted campaign against Doe 1 at work.

    a.  While alone together he cornered her and told her 'you don't know what I can do to you.'

    b.  Anderson spread a rumor that Doe 1 suffered from mental illness and therefore lacked credibility.

    c.   Anderson demanded that Doe 1 share with him every communication she had with other colleagues in an attempt to prevent her from sharing the events of the prior nights.

    d.   Anderson followed Doe 1 around campus.

72.    In February of 2014, co-workers realized the severity of the situation and approached Doe 1 regarding their concerns.  Doe 1 confessed the assault to them, and Anderson's subsequent intimidation and misconduct.

73.    The co-workers encouraged Doe 1 to report her experience to Liberty University's HR department, which she did do.

74.    Liberty University's HR Department failed to prevent Anderson from continuing his campaign against Doe 1, who he continued to stalk and defame on campus.

75.    While interviewing Doe 1, Liberty University's HR Department made clear that it viewed Anderson as wholly credible because he was a 'man of god' and Doe 1 as incredible because she was attempting to 'smear a man of god.'

76.    Doe 1 felt sufficiently unsafe that she moved from her old apartment and purchased a new car to avoid Anderson's continued stalking.

77.    In May of 2014, Liberty University's HR Department advised Doe 1 that it had completed its investigation.  Having spoken with witnesses, however, Doe 1 believed at the time and alleges on information and belief that Liberty University's HR Department had failed to interview or otherwise contact any of her witnesses.  Liberty University's HR Department advised Doe 1 that it had accepted Anderson's denial and would take no further action in the matter.

78.     Apparently for unrelated reasons, Anderson was moved to another department in the University, he nevertheless continued to harass and demean Doe 1.

79.     Doe 1 was also frozen in place and not offered opportunities for advancement, and instead saw her co-workers and junior colleagues promoted past her. She was terminated approximately a year after her report to HR.

80.     Doe 1 was never advised of the availability of Title IX support for her assault.

81.     Although Doe 1 made an actual report to Liberty University, Liberty University never investigated her report under Title IX.

### *JANE DOE 2*

82.     Jane Doe 2 is an adult individual who, in 2005, was a student at Liberty University.

83.     In February of 2005, Doe 2 was the victim of a stalker she met off-campus. She reported the stalking to the University.

84.     The University responded to the incident by giving written notice to the stalker that he was not permitted on campus, but did not allow Doe 2 to relocate from her dorm mid-semester or change the location of her on-campus job.

85.     After notice was served, Doe 2 was assaulted by three men outside of a tunnel connecting the two sides of campus.  At the time, she had been walking from her student-job to her dorm, both of which were known to her stalker.

86.     Specifically, Doe 2 was struck in the head with a length of wood, and three men, one of whom she believes to have been her stalker, tore off her clothes and gang raped her.

87.     Doe 2 reported the assault to Liberty University Police and various members of Liberty University's administration.  Liberty University did not, however, undertake a Title IX investigation.

88.     Rather than requesting a Title IX investigation—which she was not aware was her right—Doe 2 asked that the University take steps to make the tunnel safer, e.g. by installing lights, cameras, and a call-box.  She also requested counseling from a therapist that was off-campus and not affiliated with the school.

89.     Liberty University refused Doe 2's request to make changes to the tunnel, which it described as very safe and not a likely place for crimes to occur.  When Doe 2 raised her concerns with Liberty University's Executive Vice President, Ron Godwin, she was told that Liberty University was the safest University on the East Coast and that if she didn't like that she could leave.

90.     She was eventually referred by the school to an off-campus counselor, who asked her leading questions that suggested that she was at fault for her rape.

91.     She learned later that the 'counselor' she had been referred to was Carol Godwin, Ron Godwin's wife.

92.     Doe 2 eventually left Liberty University to complete her education elsewhere.

93.     In September of 2020, after Doe 2 left Liberty University, she had a meeting with Jonathan Falwell.  She was promised during the meeting that Liberty University was conducting an "independent investigation" into misconduct that had occurred at the University, and he encouraged her to "submit her case" after which she would have "a seat at the table."

94.     Doe 2 filed a complaint through the channels suggested by Falwell.

95.     In spite of its promise, however, Liberty University failed to follow up and contact Doe 2 regarding any such investigation.

### JANE DOE 3

96.     Jane Doe 3 is an adult individual who, in 2017, was a student at Liberty University.

97.     On or about October 29, 2017, starting around 8:00pm, Doe 3 attended a party with an older student athlete who she believed to be a friend.

98.     Although she denies consuming excessive amounts of alcohol, Doe 3 recalls that she was so intoxicated as to be substantially immobile by 10:00pm, and thereafter blacked out.

99.     Doe 3 recalls snatches of the night thereafter, including a time when the 'friend' who had brought her to the party was on top of her.

100.    When Doe 3 awoke the next morning, she was in an apartment that belonged to her assailant's friend.  She wrapped herself in a blanket and began wandering the house looking for help.  She found her 'friend,' who grabbed her, forced her onto the bed, digitally penetrated her, removed her bra and grasped her breasts and neck so

forcefully as to leave bruises, and forced her into penetrative sex, all without her consent and over her objection.

101.    Doe 3 attempted to report the assault to Liberty University's Title IX Department, but was told by her RA that if she did she would suffer penalties for drinking under the Liberty Way.

102.    Doe 3 made the report anyway and, as predicted, was forced to undergo "spiritual guidance."

103.    Liberty University's Title IX investigation, inexplicably, continued from October of 2017 through May of 2018.  Doe 3 was invited to participate by reviewing the Title IX investigative file once every few weeks.

104.    During the investigation, Doe 3 reported that she believed she had been drinking more than she actually recalls, in part because she struggled to believe at the time that she had been the victim of a date-rape drug.

105.    Doe 3 eventually noticed that the photographs of bruising she had provided had been removed from the Title IX investigative file.

106.    Liberty University advised that because the photographs were too "explicit" they would not be considered.  Doe 3 asked that the photographs be re-included in the file, and Liberty University never thereafter gave her access to the file.

107.    Liberty University, apparently having discarded the most relevant evidence of force, sided with the male athlete over Doe 3 and dismissed her case.  Liberty University thereafter denied Doe 3's appeal.

108.   Doe 3 moved off campus and took most of her classes on-line in order to avoid her attacker, who continued at the school and began a campaign of harassing her, culminating in a frivolous lawsuit against her.

109.   Doe 3 attempted suicide on December 8, 2017, leaving a note blaming her assailant.

110.   In March/April of 2020, Doe 3 dropped out of Liberty University.

*JANE DOE 4*

111.   Jane Doe 4 is an adult individual who, in 2017, was a student at Liberty University.

112.   Doe 4 was bullied and intimidated into physical intimacies with a member of Liberty University's Hockey Team, but was adamant with him that she would not consent to having sex with him.

113.   In the fall of 2016, in spite of Doe 4's clear refusal, the Hockey Team member forced her into sex in the back of his car.

114.   After the rape, Doe 4 texted her assailant that she had not consented, and that she 'hadn't wanted that to happen.'  The assailant responded that 'he knew that, and next time she should just slap him in the face.'

115.   Liberty University undertook a Title IX investigation and, as a component of that investigation, issued a stay-away order between the two students.

116.   Doe 4's assailant then undertook a campaign of intimidation against her by deliberately violating the stay-away order, particularly at Doe 4's work.

117. When her assailant violated the stay-away order for the first time at her work, Doe 4 asked her manager to approach her assailant and ask him to leave in compliance with the stay-away order.

118. Liberty University's Title IX Department thereafter contacted Doe 4 to inform her that, by asking a third-party to have contact with her assailant, *even to advise him he was in violation of the stay-away order,* she was herself in violation of the order. The Title IX department threatened punishment if she repeated the (bogus) violation.

119. As a result, when her assailant returned to Doe 4's place of work, she called Liberty University's Police Department and advised *them* that her assailant was in violation of the order. They came and escorted Doe 4's assailant from the establishment.

120. Liberty University's Title IX Department *again* contacted Doe 4 to inform her that she was *again* in violation of the stay away order: although Title IX conceded that it could not prevent her from calling the police when she felt intimidated by another student, she was not permitted to call the police for violations of the stay away order.

121. As a result, Doe 4 was unable to rely on the stay away order and, instead, repeatedly was forced to call the police and advise them that she merely felt 'intimidated' by her assailant while he deliberately violated the stay-away order.

122. Doe 4 eventually obtained a restraining order from the local court, whereupon her assailant finally stopped appearing at her work.

123. In spite of the text messages and the assailant's behavior, the University concluded that the sex between the two students had been consensual, apparently because Doe 4 had consented to quasi-sexual activity with her assailant in the past.

124.    Liberty University announced at Doe 4's appeal hearing that it would not consider the text messages between Doe 4 and her assailant in reaching its conclusion, and subsequently denied Doe 4's appeal.

125.    Following the University's decision, Doe 4 reported her rape to the Lynchburg Police Department, which advised her that, because it had occurred on Liberty University's campus, she was required to make the report to the Liberty University Police.  She did, and the Liberty University Police encouraged her to drop her claim altogether.

126.    Doe 4's assailant then opened a Title IX claim against *her*, ostensibly for making a false allegation against him.

127.    During the period that retaliatory claim was open, Doe 4 entered into an initially platonic friendship with a man who led her to believe that he was a member of the Lynchburg Police Department.

128.    The platonic relationship progressed and Doe 4 slept with the police officer. After she did, the officer confessed that he was not a member of the Lynchburg Police Department, but was instead a member of the Liberty University Police Department, that he had responded to her prior calls regarding her assailant, and that he might become involved in the investigation of the retaliation allegations.  He also confessed that he was married to another woman.

129.    Doe 4 thereafter became suicidal, and called an RA for suicide prevention assistance.  She was transported to the Lynchburg Emergency Department where she was kept overnight.

130.     Doe 4 finally graduated from Liberty University in 2019.

*JANE DOE 5*

131.     Jane Doe 5 is an adult individual who, in 2016-17, was a residential student at Liberty University.

132.     During her period at Liberty University, Jane Doe 5 had consensual sexual activity with her boyfriend and became pregnant.

133.     Doe 5 self-reported her pregnancy to her prayer-group leader.

134.     Doe 5's prayer-group leader informed the University's administration.

135.     Doe 5's pregnancy was not treated by the University as a self-report. Instead, she was brought into the office of a University Dean and was told that she was being evicted from campus and expelled as a direct result of her pregnancy.  She was told she had twenty-four hours to gather her things and move out.

136.     During the conversation where she was informed of her expulsion, Doe 5 was told that the University had no specific policy regarding pregnancies.  She was instead told that she was merely a liability to the University as a bad example to other students.  As a result of this, the University, acting through its employees, offered her the opportunity to remain if she agreed to marry the father of the child.

137.     Doe 5 called the father of the child, who appeared at the office with an engagement ring and requested permission to take Doe 5 on a romantic hike to propose.

138.     The University refused, and demanded that Doe 5 and the father agree to be married immediately or threatened to withdraw her from the University.  Doe 5 and the father eventually consented.

139.    The University assisted Doe 5 and the father in obtaining a marriage license, and had a staff-member solemnize the marriage.

140.    Doe 5 was thereafter permitted to continue as a student, but not to live on campus.

141.    The University never identified a policy that permitted her to remain as a student but not live on campus as a result of her pregnancy.

142.    The University never identified a policy that required Doe 5's expulsion where she self-reported a pregnancy.

143.    The University never identified a policy that permitted a student otherwise subject to expulsion to continue at the University only if married *after* she became pregnant.

144.    After Doe 5 gave birth, the University did not permit her to breastfeed or pump on campus.

145.    As a result, Doe 5 was forced to leave campus, drive to her home off-campus (she was still not permitted to live on campus) breastfeed or pump, and then return.

146.    At the time, the University allowed its employees to breastfeed on campus, and maintained secure lactation rooms for that purpose.

147.    The University never identified a policy that precluded students from breastfeeding or pumping on campus.

148.    The University never identified a policy that precluded *married* students from breastfeeding or pumping on campus.

149.     Doe 5 continued to demand to be allowed to breastfeed or pump on campus for a period of six months before the University finally relented and allowed her access to its secure lactation rooms.

## *JANE DOE 6*

150.     Jane Doe 6 is an adult individual who, in 2013, was a residential student at Liberty University.

151.     When Doe 6 matriculated at Liberty University she self-identified as a lesbian but was not 'out' to anyone at the University.

152.     Doe 6 was met with overt and systematic hostility toward homosexuality.

153.     By way of example and not limitation: during one class, a professor polled the class as to whether the students believed homosexuals would go to hell.  When a handful of students denied that homosexuals would go to hell, the professor corrected them and insisted that there was no question about that matter, that all homosexuals would certainly go to hell.

154.     During a mandatory convocation meeting, a speaker retained by the University gave a speech on the subject of repentance and listed a set of sins that the students needed to repent for or face damnation.  When he listed homosexuality, Doe 6 began to cry.

155.     Doe 6 was then taken aside by a University RA, to whom she came out for the first time during her time at the University.  The RA repeated the speaker's claim, and told her that she "still had time" to repent and become straight.

156. Doe 6 understood that homosexuality was explicitly contrary to Liberty University's acceptable student conduct and, solely as a result of the University's pressure, she made the decision to 'repent' of her homosexuality as instructed and attempted to adopt a heterosexual lifestyle.

157. Doe 6 also attempted to follow Liberty University's explicit teachings that, as a woman in a heterosexual relationship, she was obligated to follow the guidance and leadership of her male partner.

158. To that end, Doe 6 began dating a male Liberty University alumnus.

159. Maybe not surprisingly, Doe 6 was not interested in a physical relationship with her male partner; during the course of their relationship he overcame her reluctance on several occasions by serving her alcohol.

160. On or about early December of 2013, Doe 6's boyfriend invited her to his house, where he served her two glasses of wine. Immediately after drinking the second glass of wine, Doe 6 became substantially immobile from what was apparently a date-rape drug.

161. Doe 6's male partner then climbed on top of her. She attempted to prevent him from having sex with her by biting him. She recalls his yelling, and then passed out.

162. Doe 6 awoke three hours later in her partner's car. She begged to be taken to a hospital, but he declined and, instead, dropped her off at her dorm.

163. Doe 6 alerted others in the dorm that she needed medical care and she was eventually transported to a hospital.

164.    While at the hospital Doe 6 learned for the first time that she was missing the underwear and bra she had been wearing before she was drugged.

165.    After she was released from the hospital, Liberty University advised Doe 6 that she would be offered 'counseling' from the University and scheduled an appointment for her.

166.    Doe 6 understood that the 'counseling' was intended to be an opportunity for her to discuss her rape.  Instead, she was confronted by Liberty for drinking and fined $500.  She was told her transcript would not be released unless and until she paid the $500.

167.    Because Doe 6 had no or substantially no Title IX training from the University, she was not aware that there was a separate process where she could report her rape; she understood that the University's fine *was* its response to her rape.

168.    Doe 6 completed the quarter and then transferred to a different school.

### *JANE DOE 7*

169.    Jane Doe 7 is an adult individual who, in the fall of 2014 was a residential student at Liberty University.

170.    Jane Doe 7 had a platonic relationship with a male friend.

171.    Doe 7 visited her male friend at his home, off-campus, to watch a movie and, during the course of the movie, while of legal drinking age had a single glass of wine.

172.    Doe 7's male friend fell asleep during the movie, and Doe 7 began to leave.

173.    While on the way out, Doe 7 was accosted by her friend's roommate, who was at the time a student at Liberty University Medical School.  The roommate kissed her neck, pulled her into his room, and 'swooped' her pants off.

174.    During this period Doe 7 was physically resisting her assailant and verbally telling him no.

175.    Doe 7's assailant physically forced her legs apart in spite of her active physical and verbal resistance and had sex with her.  Afterward he passed out.

176.    Doe 7 went to the bathroom and discovered semen in her vagina.  Not having been educated by the University, she had no understanding of the opportunity to undergo a rape kit.

177.    Doe 7 was a member of the Office of Student Conduct's appeals board for, *inter alia,* Title IX cases, and had first-hand knowledge of the University's treatment of the victims of sexual assault.

178.    Specifically as a result of that knowledge, she made no report to the University.

### *JANE DOE 8*

179.    Jane Doe 8 is an adult individual who, from November 2008-through-Otober 2011, was an employee of Liberty University in its student conduct office.

180.    While she was an employee, Jane Doe 8 was subject to pervasive and systematic sexual harassment by her supervisor, Keith Anderson, in the form of sexually explicit comments directed toward her and to student workers and other supervisors.

181.    The University, in the person of at minimum Doe 8's direct supervisor, had actual knowledge of the harassment at the time it happened, and later the conduct was reported to HR and to student workers.

182.    The University took no action in support of Doe 8's complaint and, instead, communicated Doe 8's complaint and identity to Anderson.

183.    Anderson then retaliated against Doe 8 by, on the one hand, increasing his campaign of inappropriate and sexual comments, and on the other hand by telling others that he was 'staying away from her' because she 'thought' he said something inappropriate.

184.    Doe 8 left Liberty University in October of 2011 as a result of the bullying campaign by Anderson, although at the time she pretended that her departure was solely the result of her pregnancy and new motherhood in order to avoid exacerbating the issues created by Anderson.

185.    In April of 2012, Doe 8 contacted Laura Wallace, Jerry Falwell, Jr., Neil Askew, and Jonathan Falwell regarding the harassment that she had suffered while an employee.

186.    She received no response from any of them.

### *JANE DOE 9*

187.    Jane Doe 9 is an adult individual who attended Liberty University from 2014 through 2019, and was both a residential and on-line student at Liberty University.

188.    When Doe 9 first came to Liberty University, she was required to attend a "hall meeting" where students filled out surveys on various topics, and were given a

lecture on Liberty University's culture by University RAs.   The RA's went into detail regarding the restrictions of the Liberty Way and the consequences of violating the Liberty Way, but failed to advise Doe 9 or the other students of any amnesty in the event of sexual violence or other sex-based discrimination.

189.    While Doe 9 was a student at Liberty University, she began a consensual romantic relationship with another student there.   Her boyfriend proposed, and they became engaged to be married.

190.    Doe 9's relationship then took a dark turn.   Her fiancé began abusing her, both emotionally and physically.

191.    At first the abuse took the form of pushes and shoves, but it eventually escalated to hitting.   On one occasion, Doe 9's fiancé locked her into a gas station bathroom and attacked and strangled her.

192.    The toll of the relationship directly affected Doe 9's education.   Her GPA fell from a strong A/B average to barely passing.

193.    Doe 9 was aware that the University might have resources to assist her, but believed that her fiancé was 'above-the-law' while a Student at Liberty University.

194.    Specifically, her fiancé had previously lived and worked in Washington, DC, and had social connections with Liberty University administrators that made him appear 'untouchable' by the University's disciplinary apparatus.

195.    On one occasion, Doe 9's fiancé was invited to a party at a high-level administrator's home, where the administrator drank heavily, became drunk, and encouraged the students to drink.   Doe 9 did not, but her fiancé did.   The administrator

then made sexually explicit remarks, including regarding his wife's breast enhancement surgery, and his wife made disparaging remarks to the students regarding the Falwells.

196.    All of this conduct violated the Liberty Way, but was plainly tolerated, authorized, and condoned by the University, in the form of its high administrative officers, which, in conjunction with what she had heard from others regarding Liberty's conduct of investigations into sex discrimination, led Doe 9 to believe that a formal report to the University would be useless, or might in fact result in retaliation against her.

197.    In January of 2009, after Doe 9 and her fiancé had broken up, she sought counseling.  Although she was assigned a counselor by Liberty University, that person never advised Doe 9 of the availability of Title IX assistance.  Instead, Doe 9's assigned counselor urged her to "move on" and "leave it alone."

198.    Certain of Doe 9's professors questioned her change in performance, and she confessed the root cause, which was the domestic violence she was suffering at the hands of her fiancé.

199.    The professors told Doe 9 that they would take her report to the University's Title IX office, because of their obligations as responsible employees and indeed did do so.  Doe 9 expected that the University would undertake an investigation and, until recently, believed that the University might do so.

200.    In fact, the University has never contacted Doe 9, undertaken an investigation, or otherwise taken action based on the report.

*JANE DOE 10*

201.    Jane Doe 10 is an adult individual who attended Liberty University starting in the fall of 2013.

202.    While a student at Liberty, Jane Doe 10 began rooming with a pair of siblings, who were also students at Liberty University.

203.    The two siblings introduced Doe 10 to a family friend and student at Liberty University who they encouraged her to date.  They were themselves the daughters of a pastor with connections to Liberty University, and presented the prospective boyfriend as a pious individual who would be safe for Doe 10 to date.

204.    Doe 10 did begin dating the male student, who quickly began sexually assaulting her.

205.    The misconduct began with small refusals to honor Doe 10's wishes, like when her 'boyfriend' would come into her room with the door closed in violation of the Liberty Way.  Later he began putting his hands on her legs and sliding them under her shorts, even when Doe 10 would ask him not to, or physically try to push him away.  Eventually the assaults progressed to digital penetration even while Doe 10 was physically trying to stop him.

**206.**    As the relationship progressed, Doe 10's boyfriend compelled her to perform manual or oral sex on him with threats that he would injure her if she refused to do so, that he would injure himself, or that he would report her to the student conduct office for the sexual conduct they had already engaged in, **directly taking advantage of the weaponization of the Liberty Way.**

207.    During the summer of 2014, while at a hotel in Arkansas for a mutual friends' wedding, Doe 10's boyfriend raped her.

208.    After Doe 10's rape, her roommates—who had recommended that she date her rapist—reported Doe 10 to the Student Conduct Office.  Although Doe 10 attempted to make clear that she was the victim of a rape, Liberty University's Student Conduct Office gave her no opportunity to do so and, instead, forced her to sit with her rapist and apologize to her roommates for her violation of the Liberty Way.

209.    Afterward, Doe 10 sought counseling from Liberty, but the Title IX office never became involved in investigating her assaults and rape.

210.    Doe 10 attempted to make reports on her own, but her calls were not returned by Liberty University's Student Conduct Office.  What's more, following her graduation, Doe 10 shared the details of her assault with a friend, who shared the fact of the assault with Rebecca Falwell.

211.    Thereafter, the friend made a direct report to Liberty University's Student Conduct Office, and Doe 10 made similar reports to the University.

212.    To date, the University has never taken action with respect to Doe 10's assault and rape.

### JANE DOE 11

213.    Jane Doe 11 is an adult individual who attended Liberty University during the 2018-19 school year.

214.    Doe 11 did not receive consent training from Liberty University or otherwise receive training regarding her rights under Title IX.

215.    While a student at Liberty University, Doe 11 began a consensual romantic relationship with a male student who she believes and therefore alleges attended the University with some form of scholarship for wrestling.

216.    During the relationship, Doe 11 engaged in consensual sexual activity with the male student that violated the Liberty Way.

217.    On one occasion, however, Doe 11 declined the wrestler's advances, and he raped her.

218.    Doe 11 declined to report her assault to Liberty University out of fears that her prior consensual romantic conduct would be the subject of penalties by Liberty University.  She did, however, break up with the wrestler.

219.    The wrestler responded to the breakup by stalking Doe 11, following her around campus, and parking next to her to intimidate her.  He subjected her to an escalating pattern of verbal assaults and threats, until he finally made a threat on her life.

220.    Doe 11 called the police following the threat, and reported the wrestler—for the threat only—to the Office of Student Conduct.

221.    Liberty University began a Title IX investigation as a result of the report and was initially proactive and caring.  When the wrestler retained counsel, however, the University ceased offering any support to Doe 11.

222.    The University issued a stay-away directive as a part of its investigation, but failed to enforce it, and the stalking continued.  As a result, Doe 11 filed criminal charges against the wrestler—again, solely for the threat—and a local court issued an enforceable restraining order, which the wrestler nevertheless occasionally violated.

223.     The University never offered Doe 11 counseling, escorts, dorm or class-schedule changes, or otherwise supported her during the Title IX investigation.

224.     The investigation continued into 2020, and Doe 11's harassment continued during the same period.

225.     The University finally entered into a consent agreement with the wrestler whereby he was banned from campus during the remainder of Doe 11's time at the school.

226.     On information and belief, the wrestler will be permitted to return in 2022.

*JANE DOE 12*

227.     Jane Doe 12 is an adult individual who attended a summer camp offered by Liberty University while a minor.

228.     Doe 12 did not receive consent training from Liberty University or otherwise receive training regarding her rights under Title IX.

229.     While a minor, Doe 12 attended a summer debate camp hosted by Liberty University in June/July of 2000.

230.     One the bases for her family's selection of the debate camp was the facts that (a) student dorms were separated by gender; (b) dorms were monitored by a 'dorm-mother' twenty-four hours a day; and (c) Liberty University was understood by her and her family to be a safe and Christian environment.

231.     As part of her attendance, Doe 12 was required to sign a modified version of the Liberty Way.

232.    Shortly before a scheduled debate, Doe 12 realized that she had forgotten her notes in the dorm, and returned to her room.

233.    While in the hall, Doe 12 met a softspoken man who identified himself, as either LJ, RJ, or RC (Doe was uncertain at the time.)  She later became aware that this man was Jesse Matthew.

234.    Matthew alleged that he had made a date with another of the girls participating in the debate camp but told Doe 12 that she would "do."  He then grabbed her and carried her into a bathroom.

235.    During this period, Doe 12 screamed for help, but the 'dorm-mother' was not actually present in the building.

236.    Matthew put Doe 12 down in a shower.  She broke free from Matthew's grip, and made it to an atrium before she was caught again.

237.    Matthew threw Doe 12 into a large cushioned chair.  Before he was able to grab her again, she interposed her feet between him and her, and held him off while he groped her legs and breasts.

238.    Matthew then attempted to strangle Doe 12, and she bit his hand and arm.

239.    Matthew finally relented, apologized, asked Doe 12 not to call the police, and fled.

240.    Doe 12 immediately attempted to call 9-1-1 from a campus phone, but was unable to do so because she was shaking so badly.  She sought help from a friend, and was thereafter able to summon the LUPD.

241.    The police apprehended Matthew and conducted a show-up at which Doe 12 confirmed that he was her assailant.

242.    The responding officer, who identified him as the Chief of the LUPD, then required Doe 12 to travel in the same car as her assailant to the police station over her express objection.

243.    The LUPD then began an hours-long interrogation of Doe 12.

244.    During the interrogation, the police required her to write two separate written statements, and then accused her of fabricating her story when minor details between the two were not identical.

245.    During this time, at least one officer asked Matthews for an autograph, remarking that it would be worth a lot of money someday.

246.    The officers reported to her that Matthew had denied any contact with her. When she reminded them that the single-gender dorm had a camera that would show his entrance and exit, the police changed their story and alleged that Matthew in fact admitted to contact with her, but claimed the contact was consensual.

247.    Doe 12 told the police that the contact could not have been consensual, that she was certain she still had Matthew's DNA under her nails from fighting him off.  The police told her they were sure she did—no doubt from scratching his back during consensual sex.

248.    The police also told Doe 12 that she could be expelled from the camp because she was wearing pants in an academic building, which was at the time a violation of the Liberty Way.  Her pants were, they suggested, the reason why she had been

approached for sex. Doe reminded them, however, that the modified version of the Liberty Way she was asked to sign did not include the same dress code requirements as for college students.

249. The police then threatened her that if she did not withdraw her claim, she would be charged criminally with filing a false report. She declined to withdraw her claim, and demanded that she be provided with counsel free of charge as a component of what had become a custodial interrogation. No such counsel was provided to her.

250. Doe 12 was held for a period of eight hours without food or drink.

251. Doe 12 was not assessed by a child psychiatrist.

252. The police then began an 'investigation' into her claim, which seemed to solely consist of a demand that she strip and submit to being photographed by the chief of police.

253. Doe 12 refused, and suggested that such an investigation should be undertaken by a doctor or nurse, and that such a professional could also take samples from her nails. The police refused to transport Doe 12 to the hospital and, instead, continued to badger her until she agreed to allow herself to be photographed naked by a female debate coach.

254. The photographs were comprehensive, including a photograph in which Doe 12 was forced to lean over a desk and spread her butt cheeks for the camera.

255. At the time, Doe 12 was 15-years-old.

256. Doe 12's mother and sole guardian was never contacted regarding the photographs and did not consent to such photographs.

257.    Doe 12 was finally released by the police and permitted to get food at a campus facility named "David's Place."  Prior to leaving, the police required that she thoroughly wash her hands to destroy any DNA evidence and present her nails for inspection.

258.    The same evening and the next day, Doe 12 told her story to friends, several of whom acknowledged that they had been approached for sex by a man similar to Doe 12's description of Matthews, but had not reported the solicitation because of concerns that they would be expelled because their clothing had been too revealing.

259.    Doe 12 reported these facts to the Liberty University Police, but her friends told her that they were never interviewed.

260.    At approximately midnight, after the dorm residents had already showered before bed, Doe 12's dorm was awakened by LUPD officers who forced each of the women to leave their rooms, ostensibly so that the police could "take fingerprints" from the bathroom where Doe 12 was carried by Matthew.

261.    There is no conceivable reason for the police to take naked photographs of a minor following an assault, particularly of areas where there was no bruising or other evidence of injury, as was done in this case, and also without first securing the consent of her guardian.

262.    In 2020, Giancarlo Granda made public allegations regarding Jerry Falwell, Jr.'s predilection for sexually suggestive photographs of students, leading Doe 12 to fear that the inappropriate photographs of her were trafficked by the police to Falwell and/or others.

263.    As a result of those fears, Doe 12 has sought counseling.

264.    If Doe 12 is correct in her concerns, it is implausible that the photographs were trafficked in any way other than electronically.

265.    Matthew was later accused of rape by another Liberty University student, and eventually pleaded guilty to two murders.  He was sentenced to four life sentences without possibility of parole or geriatric release.

266.    Although the University had her telephone number, it never called Doe 12 to advise her that other of Matthew's subsequent victims had been identified.

### COUNT I: PRE-ASSAULT DELIBERATE INDIFFERENCE/HOSTILE ENVIRONMENT
### (Does 1-4 & 6-12 v. Liberty University)

267.    The foregoing paragraphs are incorporated by reference as if fully set forth herein.

268.    Liberty University had actual knowledge prior to each of the above-described assaults that its policies and procedures, as written and implemented, were enabling on-campus rapes.

269.    Indeed, it is alleged on information and belief that Liberty University had a deliberate policy, set forth above, to suppress complaints of sexual assault, rape, and other types of sexual harassment, and support accused campus predators.

*WHEREFORE,* based on the foregoing, the above-described Plaintiffs respectfully request that this Court award JUDGMENT in their favor and against Liberty University in an amount to be determined at trial, together with fees and costs pursuant to the fee-shifting provisions of Title IX, as well as pre-and-post judgment interest.

## COUNT II: POST-ASSAULT DELIBERATE INDIFFERENCE
### (Does 1-4 & 8-12 v. Liberty University)

270.     The foregoing paragraphs are incorporated by reference as if fully set forth herein.

271.     Following each of the assaults described above, high-ranking members of the University's management and Title IX program became aware of the facts underlying the Plaintiffs' injuries.

272.     In spite of that knowledge, the University either failed to take any action, or actively worked against the Plaintiffs by destroying evidence of their assaults and issuing sanctions against them.

**WHEREFORE**, based on the foregoing, the above-described Plaintiffs respectfully request that this Court award JUDGMENT in their favor and against Liberty University in an amount to be determined at trial, together with fees and costs pursuant to the fee-shifting provisions of Title IX, as well as pre-and-post judgment interest.

## COUNT III: HOSTILE ENVIRONMENT
### (Does 1-12 v. Liberty University)

273.     The foregoing paragraphs are incorporated by reference as if fully set forth herein.

274.     The Liberty Way and its weaponization by Liberty University, as well as Liberty University's well-documented pattern of discrimination against women victims and in favor of male assailants, created an atmosphere on campus that was permeated with discriminatory intimidation, ridicule and insult that was sufficiently severe or

pervasive to alter the conditions of the education and create a sexually hostile environment for each of the Doe Plaintiffs.

**WHEREFORE**, based on the foregoing, the above-described Plaintiffs respectfully request that this Court award JUDGMENT in their favor and against Liberty University in an amount to be determined at trial, together with fees and costs pursuant to the fee-shifting provisions of Title IX, as well as pre-and-post judgment interest.

## COUNT IV: RETALIATION
### (Does 1-6 8-12 v. Liberty University)

275.    The foregoing paragraphs are incorporated by reference as if fully set forth herein.

276.    Liberty University had actual knowledge of or should have known of the discrimination on the basis of sex set forth with respect to each of the above-named Doe Plaintiffs.

277.    The University's response to each of the above-named Doe Plaintiffs was so hostile as to compound their injuries, and in several cases resulted in the Doe Plaintiffs leaving the school altogether.

278.    This constitutes retaliation under Title IX.

**WHEREFORE**, based on the foregoing, the above-described Plaintiffs respectfully request that this Court award JUDGMENT in their favor and against Liberty University in an amount to be determined at trial, together with fees and costs pursuant to the fee-shifting provisions of Title IX, as well as pre-and-post judgment interest.

## COUNT V: PREGNANT AND PARENTING DELIBERATE INDIFFERENCE/HOSTILE ENVIRONMENT

*(Doe 5 v. Liberty University)*

279. The foregoing paragraphs are incorporated by reference as if fully set forth herein.

280. Liberty University had actual knowledge that it did not have written policies and procedures on how to address pregnant and parenting students, and therefore deliberately created hostile environments for those pregnant or parenting from receiving a safeguarded education free from sex discrimination consistent with due process principles.

**WHEREFORE,** based on the foregoing, the above-described Plaintiff respectfully requests that this Court award JUDGMENT in her favor and against Liberty University in an amount to be determined at trial, together with fees and costs pursuant to the fee-shifting provisions of Title IX, as well as pre-and-post judgment interest.

### COUNT VI: NEGLIGENCE (NON-TITLE IX)
*(Does 1-4, 6-8, & 10-12 v. Liberty University)*

281. The foregoing paragraphs are incorporated by reference as if fully set forth herein.

282. In each case in which a Doe Plaintiff was the victim of sexual violence, the University recklessly, wantonly, and carelessly made the individual Plaintiffs' injuries more likely to occur and harder to prosecute because of the dangerous environment it created for students.

283. The University is therefore directly liable to the Doe Plaintiffs in negligence for its *pro rata* role in causing their harms.

284.    The University's negligence was sufficiently reckless, wanton, and gross as to warrant the imposition of punitive damages.

*WHEREFORE,* based on the foregoing, the above-named Plaintiffs respectfully request that this Court award JUDGMENT in their favor and against Liberty University in an amount to be determined at trial, together with such additional amounts as this Court deems just.

### COUNT VII: 18 U.S.C. § 2255
### (Does 12 v. Liberty University)

285.    The foregoing paragraphs are incorporated by reference as if fully set forth herein.

286.    As set forth above, Doe 12 was photographed by the Liberty University Police, without a SANE nurse or other forensic professional present, while in a state of undress, including explicit positions, in spite of the fact that many of the photographs were of areas of her body that were not bruised or otherwise susceptible of showing evidence of a crime.

287.    At LUPD's direction and consent, the photographs were taken by a debate coach, not a member of law enforcement, and then (presumably) transmitted to LUPD.

288.    The procedure in this case—photographing a naked minor in multiple poses, without her guardian's foreknowledge or consent, in a police station and without forensic examination, and using an unqualified debate coach to take the pictures—fails to conform to any reasonable standard of police procedure.

289.   It is believed and therefore alleged that these photographs were taken purely to shame, harass, and deter Doe 12 from advancing her claims against Matthew and Liberty University, and/or for the prurient interest of the police department and possibly others, and not to advance any meaningful criminal investigation.

290.   In further support of this allegation, to the best of Doe 12's knowledge, no charges were ever brought against Matthew as a result of her report.

291.   In light of recent revelations regarding photographs kept by the University's then-president, Jerry Falwell, Jr., Doe 12 has reason to believe that the photographs of her, naked, as a minor, were trafficked in interstate commerce.

292.   Doe 12 learned of this for the first time in 2020.

*JURY DEMAND*

293.   Pursuant to Fed.R.Civ.P. 38(b), Plaintiffs demand a jury on all issues so triable.

**WHEREFORE,** based on the foregoing, the above-named Plaintiff respectfully requests that this Court award JUDGMENT in their favor and against Liberty University in an amount to be determined at trial, together with attorneys' fees and such additional amounts as this Court deems just.

Respectfully submitted:

Date:  *July 19, 2021*

By:     Jack Larkin
          Attorney ID 307270

**Gawthrop Greenwood, PC**
17 East Gay Street
West Chester, PA 19381
ph:     610.800.5569
fax:     610.696.7111
em:     jlarkin@gawthrop.com